Moncure, P.
This is a writ of error to a judgment 'Of the Circuit court of Bedford county, affirming a judgment of the County court of said county, convicting the plaintiff in error, Harold P. Bead, of maliciously shooting one George S. Merriman, with intent to maim, disfigure, disable and kill him. The questions arising in the case are presented by two bills of exceptions, taken by the plaintiff in error in the course of the proceedings in the County court; one of them to the opinion of said court overruling the motion of the prisoner to set aside the verdict of the jury and grant him a new trial, upon various grounds set out in the first bill of exceptions ; and the other, to the opinion of said court overruling the motion of the prisoner to arrest judgment on said verdict, upon the ground set out in the second bill ■of exceptions. I will consider these questions in their order; and first those which arise on the first bill of exceptions.
The motion to set aside the verdict and grant a new trial was based upon four grounds, viz: 1st. That the verdict of the jury was against the law and the evidence in the cause.
2nd. Because, since the rendering of said verdict the prisoner had discovered important evidence, which he could not have before discovered by reaspnable diligence, material to his defence on said trial; and which, *928 if given in before the jury, ought, and would, have produced a different verdict from the one found.
3rd. Because the jury were influenced in making up their verdict by improper considerations, not admissible under the evidence, and not warranted by it.
4th. Because of the improper and irregular treatment of the jury during the trial, by being committed, after they were sworn and during the trial, to the custody, and exposed to the influence, of a deputy sheriff, who was a wituess, and had testified to material facts on behalf of the Commonwealth on said trial.
Ought the verdict to have been set aside and a new trial granted on either of these four grounds; and,
1st. That the verdict was against the law and the evidence.
In considering this ground it may be material, first, to enquire whether the facts proved, or only the evidence introduced, on the trial, are certified in the bill of exceptions. While it is well settled that an appellate court may revise a judgment of the court below, refusing a new trial on the ground that the verdict is contrary to evidence, even in a criminal case, in behalf of the accused; yet it is also well settled that the bill of exceptions must so present the case as that the appellate court may be able to see whether sthe jury has correctly applied the law to the facts of the case, and to correct any error which the jury may have committed in that respect. Regularly, the facts, instead of the evidence, ought to be certified in the bill of exceptions; and where there is a conflict or complication of evidence, the court may, on that ground, be unable or unwilling, and, therefore, refuse, to certify the facts; and then the appellate court cannot revise the judgment, unless the evidence be certified, and then only on certain conditions. That is, the court will not in that case reverse tbe judgment, unless, after, rejecting all the parol evidence for the ex-ceptor, and giving full faith and credit to that of the *929 adverse party, the decision of the court below still appears to be wrong. As to the rule to be observed where evidence only is certified, see Ewing v. Ewing, 2 Leigh, 337; Green v. Ashby, 6 Id. 135 ; Rohr v. Davis, 9 Id. 30; Pasley v. English, 5 Gratt. 141; Bull's case, 14 Id. 613.
"Whether the court of trial intended to certify the facts, or the evidence only, is sometimes a doubtful question. Iu form, it sometimes appears that the certificate is one of facts: whereas, in substance, it is a certificate of evidence only; and so, on the other hand, it may, in form, appear to be one of evidence only, when it was intended to be one of facts. .Each case must depend upon its own circumstances, and the appellate court must determine, as well as it can, what is the character of the certificate in that respect. On this subject see Bennett v. Hardaway, 6 Munf. 125; Jackson's adm'r v. Henderson, 3 Leigh, 196; Patterson v. Ford, 2 Gratt. 18; Vaiden's case, 12 Id. 717. Where the matters certified iu form as facts are in any respect conflicting, it is evident that the certificate, iu that respect at least, is of evidence and not of facts, because facts cannot be conflicting, but must be consistent with each other.
The certificate in this case may be said to be in form a certificate of facts. It commences by saying: “The court doth certify that the following are the facts, and all of the facts, proved before the jury on said trial.” It then proceeds to state what each witness on behalf of the Commonwealth and on behalf of the prisoner “proved,” in detail; and it concludes each statement by saying, that the foregoing are all the facts proved “ on behalf of the Commonwealth,” and “ on behalf of the prisoner,” respectively.
But when we come to examine the “ facts proved,” as stated by the several witnesses, we find such a conflict between them in most material respects as to show that the certificate, though, in form, one of facts, is *930 really one of evidence only. For example, in regard to the nature and degree of violence of the blow given by Merriman to the prisoner immediately preceding the act pf shooting by the latter—a vitally important fact in the case, if that blow was the provocation which induced and caused the said act—there is a very decided conflict in the testimony, and most of the witnesses on both sides differ among themselves as to the character of that blow. Jordan Martin, a witness for the prisoner, says that “Merriman struck prisoner a violent blow in the pit of the stomach, knocking him back eight or ten feet, prisoner falling and catching on his hands.” “The blow struck by Merriman was a very heavy one—like the kick of a mule.”
Now if this be a true-account of the blow, and it, and not a previous grudge or provocation, was the cause of the shooting, such shooting could hardly be considered as malicious—at least, without satisfactory evidence that the act was done deliberately, and not in heat of blood. But all the other evidence on both sides represents the blow as not having been near so violent, while it varies materially in itself as to the nature of the blow. Merriman himself says he “struck” the prisoner, who “staggered back several feet, and drew his pistol and fired at witness.” Hogan’s evidence is to the same effect. Kearns says “he saw prisoner put his hand on Merriman’s shoulder, seemingly in a gentle manner; then Merriman gave prisoner a lick or a shove, saying ‘go away from me and let me alone; I don’t want to have anything more to do with youthen firing commenced.” From this account, taken by itself, it would appear that the blow, if blow it could be called, was slight, and that the shooting, even though caused by the blow alone, was malicious. Franklin says he “saw Merriman strike or shove the prisoner. It was between a shove and a blow; prisoner fell back about ten feet; seemed to be getting back to get his pistol;” “thinks blow not suf *931 ficieut to have forced him back.” “ The blow was not a heavy one.” Craig says “prisoner struckM. with his open hand ; M. then hit prisoner with his doubled fist. Prisoner fell back, drew his pistol, and after he recovered himself enough, shot M.”
Other witnesses besides Martin, examined in behalf of the prisoner, testified as to the nature of the blow. One of them, Lee, the prisoner’s brother-in-law, says that “M. struck the prisoner and knocked him back some ten feet. It was a heavy blow. Then prisoner drew his pistol and fired.” This testimony rather tends to confirm that of Martin. But another of the prisoner’s witnesses, Douglass, gives testimony tending the other way. lie says he “ saw M. strike or shove prisoner off several paces, and then prisoner commenced firing.” Thus describing the blow in almost the same language in which it is described by two of the witnesses for the Commonwealth, to wit: Kearns and Franklin, and concurring with them in representing the blow to have been a slight and not a heavy one.
There are other material facts about which there is a conflict in the evidence; but enough has been stated to show that the County court really certified in the bill of exceptions the testimony in full of the witnesses, and not the facts only, which the court considered to be proved by them.
Regarding the certificate, then, to be one of evidence, and not of the facts which the court considered to be proved by the evidence, we must reject the evidence in behalf of the prisoner, and consider the case upon the evidence on the part of the Commonwealth, according to the rule established by cases before referred to. See Vaiden's case, 12 Gratt. 726, and the cases there cited. Applying that rule to the case, it will be found, I think, to be a very plain one. "We have only to take the testimony of the witness, Merriman, who states the whole case from the beginning to the end; examine, in con *932 nection with it, some few circumstances omitted by him stated by other witnesses for the Commonwealth^ anC* en<Wre whether, upon the case thus presented, this court would be warranted in reversing the judgment upon the ground that the verdict was contrary to law and the evidence.
Before I review Merriman’s testimony, I will remark in regard to it, that it seems to be in conflict with none of the other testimony, either that in behalf of the Commonwealth, or that in behalf of the prisoner. He-omits, perhaps from inadvertence, a few particulars stated by other witnesses, but those particulars are consistent with what he states. Even the testimony of the prisoner’s witness, Martin, in regard to the severity of the blow given by Merriman to the prisoner, is not in conflict with the testimony of Merriman, who, while he gives no particular description of the severity of the blow, admits that he “ struck” the prisoner, who “staggered back several feet, and drew his pistol and fired at witness.” The testimony of this witness is, therefore; no doubt substantially true. But whether so or not, if must be so considered in disposing of the question now before us.
Merriman states that he had played at cards with prisoner and others, at the November term, 1871, of Bedford County court, and had then lost .a twenty dollar note, which he believed had been stolen from him. At January term, 1872, of said court, at Liberty, and in the morning of said day, witness went to prisoner and mentioned the loss of the note to him, and prisoner said he was innocent in the matter, and if witness would give him time he would show his innocence. Witness-then told prisoner he would give him time. In the afternoon of the same day witness went again to prisoner and asked him about the note. Prisoner again said that if witness would give him time he would show his innocence; and witness again told him he would give him *933 time. At the following February term of said court witness again went to prisoner about said note, and prisoner again asked for time, which witness again .agreed to give. At the following June term of said •court witness again called on prisoner about said note, when prisoner gave witness an account of said note, which witness said he knew was false; and, therefore, witness told the prisoner that he had stolen the note. Prisoner then said to witness that witness must take back that charge, or he would shoot him. Witness replied to prisoner, “Shoot, then, if you choose; I will not take it back.”
On the 11th day of July following, in the night time, prisoner was passing along the public road near the residence of the mother of witness, with whom witness lived, and called witness out in the road where prisoner was •sitting on his horse, and had a conversation with witness about the note, and told witness he must take back the charge he had made against prisoner about the note. Witness said to prisoner that he would not take it back. Prisoner then said to witness that if he did not take it back he would shoot him. Witness replied, “Shoot then.” And prisoner rode off home, saying, I will see you again at court. On the 23d day of July (same month) witness came to Liberty court day. About 10 or 11 o’clock in the morning he saw prisoner in the •courthouse yard, near the door of the office of James F. Johnson, engaged in conversation with Preston Burton. Witness went to where prisoner was engaged in this conversation and found it was in regard to the bank note. After some conversation had about the matter between Burton and the prisoner, prisoner said to witness that he, witness, had told the prisoner that Burton had said that he, Burton, had seen the prisoner take the note from the pocket of witness, and that Burton denied that he had ever said so. Witness then said that he had never said to prisoner that Burton made that statement. *934 Prisoner insisted that witness had said so ; whereupon witness told the prisoner that he was “a damned liar; that he had stolen his money, and he could prove it on him.” Witness and prisoner after this went to a bar room in Liberty, and were seated .together alone on some barrels. The note was again made subject of conversation by prisoner, when the prisoner said to witness that witness must take back what he had said to-him about the note, or he would shoot him. Witness replied, shoot then; that he would not take back anything he had said; and that if he, the prisoner, did shoot, he had better put in a good one. Afterwards, about 12 o’clock of the same day, prisoner and witness again met at the grocery store of John Caddie, in Liberty. After they had been there, Mr. Caddie gave them each a glass of liquor. Witness drank a little and was about leaving, when prisoner was drinking his liquor, and called to him and said that he must take back what he had said, or he would shoot him. Witness replied that he, prisoner, might shoot as much as he pleased; that he, witness, would not take back anything he had said.
After the interview spoken of between prisoner and witness at the bar room, witness went to his sister (Mrs. Lucy Dennis), who resides in Liberty, and borrowed from her the pistol which he subsequently used in the fight with prisoner in front of Perguson’s hotel. It was a five shooter, similar to the one used by prisoner in the fight, and every chamber was loaded. In the afternoon of said day, between the hours of 3 and 6 o’clock, the prisoner called witness to him and asked him to take a walk; that they walked across -the street, and when they reached the front of the door of Perguson’s hotel facing the courthouse lot, witness said to prisoner that he would go no further; that he intended to go into Perguson’s and get a drink; prisoner then said this matter must be settled right now; witness then said let *935 it be settled then; prisoner then said ‘ ‘ you must take back what you have said, or I will shoot you witness replied, shoot, damn you, shoot; I am tired of this talk; and used a vulgar expression to prisoner. Prisoner then pushed witness off, and witness struck him, and prisoner staggered back several feet and drew his pistol and fired at witness, and struck him on the shoulder; witness then attempted to draw his pistol, and found some difficulty in getting it out; after witness got his pistol out he presented it at prisoner, and before he fired, prisoner fired his second shot, which struck witness on his right arm as it was extended, and caused witness to lower his arm, and witness fired his ball from his pistol, he thinks, into the ground. Prisoner fired some three or four shots in all. "Witness fired only one shot, and snapped his pistol several times at prisoner, but could not get it to go off but once. After prisoner had ceased firing, he ran into Ferguson’s hotel, and witness pursued him to the door.
Witness was shot in two places—on the top of the right shoulder, and on the front of the right arm, between the elbow and the top of the shoulder. The ball that struck the shoulder went out in rear of the shoulder, and the one that struck the arm ranged upwards along the arm, and lodged in the muscles over the right chest. Immediately after the shooting, Dr. JBowyer dressed the wounds and cut out the ball that was lodged as aforesaid. Witness was in bed about Wo days from his wounds; was lying about the house about two weeks, and they were well at the time of the trial. When the difficulty occurred in front of Ferguson’s hotel witness did not think, as he stated, that prisoner intended to shoot until he saw him draw his pistol. Witness and prisoner had both been drinking during the day on which the shooting occurred, and both were under the influence of liquor when the shooting took place.
Wingfield, another witness for the Commonwealth, *936 states that he was at the livery stable of John W. Scott, *n Liberty, a short time before the difficulty occurred; prisoner there; prisoner asked him if he, prisoner, got into a difficulty, whether witness would stand by him; further enquired if he, prisoner, needed bail, whether witness would go his bail. Merriman’s name was not mentioned by prisoner in this conversation; prisoner was drunk; was very much under the influence of liquor.
Scott, another witness for the Commonwealth, states that prisoner put up his horse at the livery stable of witness in Liberty, on the morning of the 23d of July. Saw him again about 2 o’clock of that day; was talking a heap of foolishness, and said something about that money; said George must take that back; if he didn’t take it back there would be some shooting. Witness thought it was liquor talking. Prisoner was drunk— so drunk that he staggered; had to hold to a peg in the stable in order to be able to stand. This was an hour or more before the shooting occurred. Prisoner and Merriman seemed always to be friendly; saw them walking the street together a short time before the difficulty.
In regard to the conduct and manner of the prisoner at the time of the shooting, Franklin, a witness for the Commonwealth, says “prisoner seemed to handle himself well and very cool;" and Martin, a witness for the prisoner, says “prisoner rose and drew his pistol from under his coat tail, and shot at Merriman two fair and deliberate fires, as if he had a post planted; did not seem to be excited or alarmed.”
I have stated the evidence (or so much of it as seems to be material to be stated in the view I am now taking of the case) thus fully, because it is necessary to make such a statement in order to determine the question now before us, whether the verdict of the jury was contrary to law and the evidence, and whether, on that ground, *937 the judgment ought to be reversed. And now, with the case before us as it appears upon the record, I will proceed to consider that question.
■ There is certainly no good ground for dispute about the law which is to govern us in the decision of the question. The conviction was of malicious shooting with intent to kill. Whether the prisoner was guilty of malicious shooting with intent to kill or not, depends entirely upon the question whether, if the prisoner had killed Merriman, iustead of only wounding him (with intent to kill, &c.,) the offence would have been murder, either in the first or second degree—it matters not which—or would have been only manslaughter, or homicide in self-defence. If it would have been murder, then the prisoner was guilty of the offence of malicious shooting with, intent to kill, of which he was convicted. If it would not, then he was not guilty of that offence, however guilty he might have been of another offence, as of unlmoful shooting with intent to kill, &c. That it would have been homicide in self-defence, is not pretended, and there is certainly no ground for pretending. The only question, therefore, is whether it would have been murder or manslaughter.
The distinctions between murder and manslaughter, at least so far as concerns this .case, have been settled for centuries, and can admit of no question ; and I will not take time to repeat what has already been repeated more than a thousand times, the definitions of these two offences. I will only say on this subject that every unlawful homicide must be either murder or manslaughter ; and whether it be one or the other depends alone upon whether the party who perpetrated the act did it with malice or not—malice either express or implied. That one word malice is the touchstone by which the grade of the offence must be determined. "When a homicide is . committed in the course of a sudden quarrel or broil, or mutual combat, or upon a sudden provocation, and *938 without any previous grudge, the offence may be murder or manslaughter, according to the circumstances of the case. Of which circumstances the most important generally, are the nature and degree of the provocation ; the manner in which it 'was resented; the character of the weapon 'used for the purpose, and whether it was casually or accidentally at hand, or was prepared for the purpose of doing such an act and carried secretly about the person. A reasonable provocation is always necessary to reduce a felonious homicide, committed upon sudden provocation, from the degree of murder (which is its presumed degree), to that of manslaughter ; and especially where the offence is committed with a deadly weapon. Words alone, however insulting or contemptuous, are never a sufficient provocation to have that effect, at least where a deadly weapon is used, so teuder is the law of human life, and so much opposed is it to the use of such a weapon.
It is not only necessary in such a case and for such an effect that a reasonable provocation should be received, but it is also necessary that the provocation should have the effect of producing sudden passion under the influence of which alone the offence is committed. It must be a sudden transport of passion, which the law calls furor brevis. If a person on receiving the gravest provocation, is unmoved by passion, but wantonly and wilfully and wickedly kills his adversary otherwise than in self-defence, he is guilty of murder. The law mitigates the offence to manslaughter, only as an indulgence to the infirmity of human nature. Provocation without passion or passion without provocation will not do ; both must concur to reduce the offence to the grade of manslaughter.
Again, if an unlawful homicide be committed in pursuance of a preconceived purpose, the offence will be murder, no matter how great sudden provocation may have immediately preceded the act. The provocation *939 may have been brought about or sought by the perpetrator; or he may have availed himself of it to give color of justification or excuse to his act, done in exeeution of his deliberate purpose. It is true that where there is both an old grudge and fresh provocation, the jury ought rather to presume, in the absence of sufficient evidence to the contrary, that the homicide was induced by the fresh provocation, and not by the old grudge. But then this is a matter for the jury on all the evidence before it, and there is generally sufficient evidence in every such case to satisfy the jury beyond a doubt which one of these' two concurring motives induced the act.
In this case, if there had been no evidence of an antecedent grudge, or of previous threats and preparation for the commission of the act; in other words, if it had been the case of a homicide committed alone on sudden provocation ; and the jury had found the accused guilty of murder, it would have been difficult, consistently with the rules of law, even for the court of trial to set aside the verdict, much less for an appellate court to reverse the judgment on the ground that the verdict was contrary to law and evidence. It would have been a question for the jury to decide upon all the evidence ; and, looking to the nature of the provocation, being between a shove and a blow, according to some of the evidencé ; to the deadly nature of the weapon used by the offender, which was carried secretly about his person, perhaps for the very purpose ; to the cool and deliberate manner in which he used it, thus indicating an absence of sudden passion, and the presence of a malicious purpose ; even the court of trial could not well have said that the evidence did not warrant the jury in finding such a verdict. But that court being satisfied with the verdict, and refusing to set it aside, surely an appellate courtwould not have reversed the judgment.
But in this case there was abundant evidence of an antecedent grudge and previous threats, and preparation *940 for the commission of the act. Merriman had lost a twenty-dollar note, and suspected the prisoner of stealing it. The prisoner asked for time to show his innocence, and repeated the request from time to time, which Merriman as often granted him. At length the prisoner having given an account which was not satisfactory to Merriman, but which, on the contrary, confirmed his suspicion, he charged the prisoner with the theft. Witness then said that Merriman must take back the'charge or he would shoot him. Merriman replied “shootthen, if you choose; I will not take it back.” Without i*epeating the evidence on this subject again,- it is enough to say that this threat of the prisoner and this reply of Merriman were repeated as many as five different times, and at different places, almost in the same words, down to the time of the commission of the act, immediately preceding which the prisoner said, for the last time, “ you must take back what you have said, or I will shoot you.” Merriman replied, “shoot, damn you, shoot; I am tired of this talk,” and used a vulgar expression to prisoner. Now, although both the prisoner and Merriman drank freely on the day of the commission of the act, and were under the influence of spirit at that time, yet it does not appear, and it is not probable, that they were under such influence on the former occasions when the threat was made. The prisoner prepared himself with a deadly weapon, to wit: a five-shooter, in good order for shooting, which he carried secretly about his person. It does not appear that he had been in the habit of carrying such a weapon secretly about his person, and as it is unlawful to do so habitually (Code ch. 195, § 7, p. 803), the jury might well have presumed that he provided himself with this weapon for the special purpose of executing his threat whenever he could find a favorable occasion for doing so, unless he could intimidate Merriman to retract the charge he had made against him. These acts, connected with the actual shooting *941 which followed as aforesaid, and the circumstances under which it was done, strongly tend to show that the act was deliberately done in execution of his prior threats that he would do precisely what he did do. And this is greatly confirmed by what he said to "Wingfield about being his bail if necessary.
blow, could the judge who presided at the trial of this case say that the jury were not warranted in finding that the shooting was malicious, even if he could have said that, if upon the jury, he would have found a different verdict from that which was found ? Could he have said that the evidence was plainly insufficient to sustain the verdict ? It was a case peculiarly proper for the determination of the jury upon all its facts and circumstances. The judge who presided at the trial, and who, like the jury, saw the witnesses and heard them give their testimony, was satisfied with the verdict, and refused to set it aside. And the judge of the Circuit court has affirmed the judgment of the County court, giving his reasons for so doing in an able opinion, which is inserted.in the record. Can this court, which has not the great advantages that the jui’y and the court of trial had, in seeing and hearing the witnesses, but must look at the case in the necessarily imperfect manner in which it is presented in the record, undertake to reverse the judgments of two courts, and to set aside the verdict of the jury, in a case which it was their peculiar province to decide, and which they had so much better means of deciding than this court can possibly have? This court, though it has the power to reverse the judgments of the courts below, and set aside the verdict, has no power to decide the cause; all it can do in that way is to remand the cause for a new trial by another jury. But it has already been tried by one jury, and there is no good reason for believing that another jury would come to a different result. But whether they would, or might, or not, I- think this is- *942 clearly a case in which we ought not to reverse the judgment on the ground we have been considering. For the rules which govern this court in such a ease, I refer to the following decisions: In civil cases, Ross v. Overton, 3 Call, 309; Brugh v. Shanks, 5 Leigh, 598; Mays v. Callison, 6 Id. 230; Brown v. Handley, 7 Id. 119; Mahon v. Johnston, Id. 317; Bell v. Alexander, 21 Gratt. 1; and Blosser v. Harshbarger, Id. 214; and in criminal cases, Slaughter’s case, 11 Leigh, 681; McCune’s case, 2 Rob. R. 771; Hill’s case, 2 Gratt. 594; McWhirt’s case, 3 Id. 594; Grayson’s case, 6 Id. 712; Vaiden’s case, 12 Id. 717 ; and Bull’s ease, 14 Id. 613. In Ross v. Overton, Judge Roane, delivering the resolution of the whole court, laid down the principle (in language which has since been cited and approved in many cases) thus: a- new trial, on the ground that the verdict is contrary to evidence, “ought to be granted only in case of a plain deviation, and not in a doubtful one, merely because the court, if on the jury, would have given a different verdict; since that would be to assume the province of the jury, whom the law has appointed the triers.”- In Brugh v. Shanks, Judge Carr, after quoting the above language of Judge Roane, says : “ These remarks are applied to the court which presides at the trial, and has all the advantages (possessed by the jury) of seeing and hearing the witnesses : how much more strongly do they apply to an appellate court, deprived of these all important aids in eviscerating truth % But here they apply a multo fortiori; for not only have the triers appointed by law found the verdict, but the court which heard the witnesses has refused the new trial. In such a case the ‘deviation’ must be gross and palpable indeed, before I could agree to interfere with the verdict.” “Perhaps, as a juror, I might have hesitated to find the verdict this jury found; but, assuredly, I should not, .as the presiding court, have set aside its verdict as against evidence; and much less, as an appellate court, can I agree to disturb it.”
*943 In Mays v. Callison, Judge Carr’s opinion, in which the whole court concurred, was to the same effect; and so also in Brown v. Handley, and in Mahon v. Johnston. In Slaughter's case, in regard to the question whether a homicide was committed in consequence of present provocation or a previous grudge, the court quote the following appropriate language from the case of Regina v. Kirkham, 8 Carr & Payne 115, 34 Eng. C. L. R. 318 :
'’•'If a person has received a blow, and in the consequent irritation immediately inflicts a wouud that occasions death, that will be manslaughter. But he shall not be allowed to make this blow a cloak for what he does; and therefore, though there have been an actual quarrel and the deceased shall have given a great number of blows, yet if the party inflict the wouud, not in consequence of these blows, but in consequence of previous malice, all the blows would go for nothing.” “ And so in the case before us,” said the court in Slaughter's case, “ we may say the deceased committed a violent assault upon the prisoner in throwing the brick at him ; but did the prisoner shoot him in consequence of the ungovernable passion excited by that assault ? or did he seize upon it as an opportunity of gratifying his previous malice, and carrying into effect a preconceived design to take the life of the deceased? Those were questions that belong to the jury to decide ; and if the record contains testimony from which the jury might reasonably conclude, as they did, that the killing was the result of malice aforethought, then it would be an invasion of their province for this court to interfere and set aside their verdict.” In McCune's case the language of the court is very strong on the same subject. In' Hill's case the court say: “ Has the Commonwealth made out a case of wilful, deliberate and premeditated killing ? And here it should be premised that this was a question resting upon the tendency and weight of' the evidence, and proper for the jury to determine. And where the jury and the *944 judge who tried the cause concur in the weight and influence to be given to the evidence, it is an abuse of the aPPe^a^-e Powers of this court, remote as it is from the scene of the transaction, having the evidence only-on paper, divested of many elements which enter into every jury trial, and which, from their nature, cannot be presented on paper, to set aside the verdict and judgment, because the judges of this court, from the evidence rs] written down, would not have concurred in the verdict. Although we have, contrary to the rule of the English courts, decided that it is within the appellate powers of this court to set aside a verdict because it was not authorized by the evidence; yet it is only in a case where the jury have plainly decided against the evidence, or without evidence, that this appellate power will be exercised. McCune's case, 2 Rob. R. 771.” To the same effect is McWhirt’s case. In Grayson's case, 6 Gratt. 723, Judge Scott lays down the principles which have been settled in regard to new trials, motions for which, he says, are governed by the same rules in criminal as in civil cases. I think this case falls under the fourth rule stated by him (if under any) supposing the evidence to be contradictory and the verdict to have been against the weight of evidence; in which case, he says, “ a new trial may be granted by the court which presides at the trial; but its decision is not the subject of a writ of error or supersedeás, or examinable by an appellate court.” In Vaiden's case it was held that a bill of exceptions in a criminal case, upon the refusal of the court to grant a new trial on the ground that the verdict is contrary to the evidence, is to be framed in the same way as the bill of exceptions in civil cases to the like refusal is framed; and that in reviewing the judgment of the court below, the appellate court will not reverse the judgment on the ground that there is a doubt of its correctness; but it must be satisfied that the evidence is plainly insufficient to warrant *945 the verdict. See also Kate's case, 17 Gratt. 561. In the last case decided by this court on the subject, Blosser v. Harshbarger, supra, decided in 1871, my brother Christian, in whose opinion the other judges concurred, declared that “the rules of law under which a court is warranted in setting aside the verdict of a jury and granting a new trial are too well settled and firmly established by the decisions of this court to admit of doubt, or even serious discussion”—and he then repeated and re-affirmed them.
I have thus far been considering the case as upon a certificate of evidence only, and according to the rule which applies to such a case, have disregarded the parol evidence in favor of the prisoner. “But the result will not be varied,” as was said in Bull's case, 14 Gratt. 618, 622, “even if the objection to the form of the bill of exceptions be disregarded, and all the evidence therein set forth as well for as against the prisoner be considered. In pursuing that mode of deciding the case, it would, of course, be necessary to disregard all the evidence of the prisoner in conflict with the evidence against him. Eor, indeed, will it be varied if we consider the certificate as a certificate of facts, if it be possible so to consider it; nor even if we regard the evideuce of the prisoner as true where it is in conflict with the evidence of the Commonwealth, and to that extent reject the latter evidence, thus reversing the rule which properly applies to such a case. In any view which can be taken of the case, the question was a proper one for the jury to decide upon all the evidence before them.' And the jury having so decided it, and the judge who presided at the trial having been satisfied with the verdict and refused to set it aside, this court cannot properly reverse the judgment, on the ground that it was contrary to the evidence.
I will now consider the other grounds of the motion to set it aside; and,
*946 2ndly. As to the ground of after-discovered evidence.
It is admitted that the rules on this subject are correctly laid down in 3 Wharton’s Am. Cr. Law, § 3161, and Thompson’s case, 8 Gratt. 641; and that after-discovered evidence, in order to afford a proper ground for the granting of a new trial, must: 1st, have been discovered since the former trial; 2ndly, be such as reasonable diligence on the part of the defendant could not have secured at the former trial; 3dly, be material in its object, and not merely cumulative and corroborative or collateral; and, 4tbly, must be such as ought to produce, on another trial, an opposite result on the merits. Without saying anything in regard to whether the first and second of these four requisitions are complied with in this case,' I think it very clear that the third and fourth are not. To say the most of it, the alleged after-discovered evidence is merely cumulative and corroborative, and is not such as ought to produce on another trial, an opposite result on the merits. It does not tend to discredit Merriman ; and if it did, the general rule is that a new trial will not be granted, where the object is to discredit a witness on the opposite side. 3 Whart. § 3184; Thompson’s case, supra. In regard to “the remarkable statement of John W. Scott, that he knew that the twenty dollar bank note spoken of was not stolen by the prisoner, but was won in gaming by him from Merriman,” I agree with the learned judge of the Circuit court in saying, that said statement, “if true, would not be relevant or material testimony on the trial of the prisoner for malicious shooting. But it does seem very strange that this person who was examined as a witness on the trial, and who knew of the difficulty between Merriman and the prisoner, and that the latter was threatening to shoot the former for charging him with stealing the note, should never have spoken of it until after the trial, when one word from him would have settled all difficulties between them.” I am of *947 opinion that the alleged after-discovered evidence afforded no good ground for a new trial.
3dly. As to the ground that the jury were influenced in their verdict by improper considerations.
The only support offered to sustain this ground was the affidavit of Scott, that he heard two of the jury say that they had rendered their verdict in part on account of the defendant’s failure to explain before them the matter of the twenty dollar note which he was charged to have stolen. To say nothing of the doubtful character of this witness for veracity, for reasons before stated, it is euough to say, that even the affidavits of the two jurors themselves to the same effect would have been an insufficient ground for setting aside the verdict •of the jury. “Though the former practice was different,” says Wharton, “it is now settled in England that a juror is inadmissible to impeach the verdict of his fellows. 4It would open each juror,’ declared Mansfield, ■C. J., {to great temptation, and would unsettle every verdict in which there could be found upon the jury a man who could be induced to throw discredit on their common deliberations.’” 3 Whart. § 3155. In this country the English rule has generally been adopted. Id. In Thompson’s case, 8 Gratt. 641, 650, Thompson, J., in delivering the opinion of the court, admitted the well settled English, rule, and the great preponderance of American authority in the same way, and he quoted the strong language of Chief Justice Hosmer, in 5 Conn. R. 348, that “the opinion of almost the whole legal world is adverse to the reception of such testimony, and in my opinion, on invincible foundations.” In Bull’s case, 14 Gratt. 613, 626, 632, most of the authorities, English and American, including those of our own State, on this subject, were referred to; and this court concluded that, “in view of all the authorities, and of the reason on which they are founded, we think, as a general rule, the testimony of jurors ought not to be received to *948 impeach their verdict, especially on the ground of their 0Wn misconduct.”
But in this case we have not the affidavit of the two jurors themselves, but only the affidavit of a third person, as to what he says he heard them say; and it is laid down that “the affidavit of third persons as to what they have heard jurors say respecting their verdict, is inadmissible to impeach it.” 3 "Wharton, § 3156. In this case, too, we have counter affidavits of two others of the jury, that in deciding the case and rendei’ing their verdict, the question of the guilt or innocence of the prisoner in taking the twenty dollar note which Merriman charged the prisoner with having taken, was not discussed or considered by the jury—at least, so far as the affiants heard or believed. I am of opinion that the ground thirdly relied on as aforesaid for setting aside-the verdict was insufficient for that purpose.
4thly. As to the ground that the jury, after they were sworn and during the trial, were committed to the custody and exposed to the influence of a deputy sheriff, who was a witness and had testified to material facts in behalf of the Commonwealth on said trial.
I do not think I can answer this objection in stronger or more appropriate language than that which was used by the learned judge of the Circuit court on the same subject, and which, therefore, I adopt as mine. “The counsel for the prisoner argue that this was improper, and liken it to a case of a separation of the jury, or their'improper intercourse with persons not of the jury. If it had even been shown that the deputy sheriff1 was an important witness, or had any feeling against the prisoner, it seems to me that it would be going a great length to presume that he had violated his duty and his oath, by speaking to the jury on the subject of the trial. He took an oath that he would not speak to them himself on the subject of the trial, nor suffer any other person to speak to them. The sheriff is obliged to speak *949 to the jury as relates to their comfort or wants, and under the law, he is obliged to take care of and provide for them, and have the custody of them during the recess of the court; and because he happens to be called upon as a witness to prove a fact in the case, however immaterial or unimportant, it seems to me that it ought not to be presumed that he violated his duty and his oath, without any motive for so doing.
In this case it does not appear that the deputy was summoned as a witness. He was not examined in chief, but was called on as rebutting evidence to prove a single fact, viz: that the prisoner did not fall when he was stricken by Merriman—a fact not very material, and which was proved by a number of other witnesses who testified in the cause—indeed, by every one who testified on the subject, except Jordan Martin. The sheriffs who had custody of the jury were sworn in court every evening in the presence of the prisoner and his counsel; and if there was any objection to any of them having charge of the jury, it ought to have been made then; and if there was any reason for it, the court would doubtless have prevented any improper person from having charge of it. That the deputy sheriff, Uasey, should have been casually called on in the progress of the trial, to prove a single fact which transpired in his presence, and had been already proved by several witnesses, certainly did not show that he had any feeling about the result ■of the prosecution, or legally disqualify him from keeping the jury. It did not tend to show that he was an unfit person to perform that office, and he might, notwithstanding that fact, have been a very fit person for that purpose. The prisoner may have had perfect confidence in his integrity, aud may have preferred that he should continue to keep the jury after he had given evidence. That he was sworn for that purpose in the presence of the prisoner, without any objection being made on his part, shows that he had no objection to *950 make; and it is now too late to make such an objection, for the first time, in the appellate court,' even if it could have been made successfully at any time. It will be presumed that the officer performed his duty and his oath, in the absence of any evidence to the contrary.
My attentioffhas been called to the case of McElrath v. The State, 2 Swan R. 378, which is supposed to have a material bearing on the question I am now considering. I always regard with respect a decision of the highest court of a sister State, especially when it is supported by good reasons, although it is not a binding authority in this State. Butin my opinion, and with all respect for the - opinions of those who differ from me, that case is not at all in point. There a new trial was awarded a prisoner convicted of manslaughter, because it appeared that during the progress of the trial the prosecutor spent a night in the room with the jury, who' had been committed by the court to the care of a constable, though the prosecutor was the sheriff of the county, and all exceptions to the competency of the panel of jurors summoned by him were waived by the prisoner, and though the prosecutor stated in an affidavit, that he “made use of no means of any sort to influence the jury.”
Of all persons concerned in a prosecution, the prosecutor himself is the most interested, and the most unfit to have charge of the jury; and accordingly, in that case, the jury was placed in the care of a constable, who took an oath to keep them separate from all other persons, and suffer no one to have any communication with them. Under these circumstances, it -was an act of great misbehavior in the prosecutor (though he was sheriff) to obtrude himself into the room with the jury and stay with them all night, and it was an act from which the prisoner might have sustained great detriment, notwithstanding the affidavit of the sheriff that he made use of no means to influence them. It is true *951 that the court, in its opinion in that case, makes use of an expression which, taken by itself, might seem to imply that a witness is in no case a proper person to have charge of a jury. But we must construe this expression with the context. “The simple inquiry, then, is (say the court): Can it be tolerated that the prosecutor may, at his pleasure, associate and hold communication with the jury during the progress of the trial? And this inquiry, it seems to us, admits of no discussion, if the * purity of the trial by jury be deemed worthy of preservation. If the prosecutor may do so, who may not? May not any stranger to the prosecution, or any witness in the case, or any relative of the deceased, thus intrude himself upon the jury ?” The responsibilities of a prosecutor, further say the court, “are of a nature to inspire him with a feeling of personal interest in the result of the prosecution. He may be, and frequently is, a witness; his reputation is, in some degree, not unfrequently involved in the issue; he is liable to be subjected to costs, in the event that the court should be satisfied that the prosecution was either frivolous or malicious; and likewise to an action for damages at the suit of the injured party.” How unlike in its circumstances is that ease to this ? If, in this case, Merriman had intruded himself into the same room with the jury and staid all night, and conversed freely with them, the cases would have been more alike. Here, after the testimony in chief was closed on both sides, a deputy sheriff was called on by the attorney for the Commonwealth and testified to a single fact of little importance, which happened to be within his observation, and which bad already been proved by nearly all the witnesses on both sides. After this the deputy was sworn, as on former occasions, iu the presence and without any objection of the prisoner or his counsel, to keep the jury; and the only question is, whether, as matter of law, the verdict *952 is invalid for such a cause aud under such circumstances ? I say, clearly not.
I am of opinion that this fourth and last ground relied on for setting aside the verdict was insufficient for that purpose. • ^
And now I have but one remaining point to consider, which is the point presented by the second bill of exceptions, to wit: that on the 11th day of September 1872, when the prisoner was brought into court to hear judgment on the verdict, the term of the court at which he was tried had ended, and it was not competent for the court to enter up judgment on said verdict: and, therefore, that the court ought to have sustained, and not overruled, his motion to arrest said judgment on that ground.
JBy the Code, ch. 152, § 15, it is provided, that “ every such term of said courts (to wit: the couuty courts) may continue, if it be a monthly term, not exceeding six •days, and if it'be a quarterly term, not exceeding twelve days.” By the act of April 27, 1867, acts of Assembly 1866-’67, ch. 118, § 3, p. 944, the 15th section of ch. 157 of the Code is amended and re-enacted, the amendment providing that “ every such term of said courts may continue, not exceeding fifteen days, and may adjourn from day to day, or to any day within the fifteen days.” By the act of April 2, 1870, acts of Assembly 1869-’70, ch. 38, p. 35, passed after the adoption of the present constitution, chapter 157 of the Code of 1860, was amended and re-enacted. The chapter as amended consisted of 11 sections, while the original chapter consisted of 18. The amended chapter, § 2 provides, that “there shall be held in each county of this Commonwealth, monthly, a term of the County court, to be held at the times prescribed by law, and with the jurisdiction hereinafter provided.” But neither in that section nor any where else in the chapter, is any thing said about the duration of the term; while § 10 repeals “all acts *953 and parts of acts inconsistent with the provisions of this act.” If this act repeals the provision of the act of 1867, fixing the duration of the term at fifteen days, then there is now no other limitation of the term than that which is implied in the declaration contained in the act of 1870, that there shall be held in each couuty, monthly, a term of the County court, to be held at the times prescribed by law—the effect of which would be, that the term must commence at the time prescribed by law, but might continue as long as the business of the •court required; not longer, however, than until the day fixed for the commencement of the next succeeding term. If this be the true construction of the act of 1870, then certainly the term of the court at which the prisoner was tried had not ended when the judgment against him was pronounced.
But it is contended that the provision in the act of 1867, fixing the duration of the term, not being inconsistent with any provision of the act of 1870, is not repealed by that act, but yet remains in full force ; that the term of the court at which the prisoner was tried could not be continued longer than fifteen days, counting the Sundays which happened during that period in the number of days fixed for the duration of the court; and that the judgment having been pronounced on the 11th day of September 1872, which was the sixteenth day from the commencement of the term, counting the two Sundays which intervened (though only the fourteenth day from said commencement, not counting those Sundays), the said judgment was pronounced after the end of the term, and therefore was void.
The question whether the aforesaid provision of the act of 1867 was repealed by the act of 1870, is an interesting question, but not necessai’ry to be decided in this case in my view of it. As I am clearly of opinion that, if the said provision was not so repealed, but yet remains in full force, and the duration of the term of *954 the County court is still limited by law to fifteen days, Sundays are not by'our law judicial days, andaré not to be counted in the number of the fifteen days during which the County court is authorized by law to set in a term. The term “may continue not exceeding fifteen days,” that is juridical days on which the court may lawfully set, and not including Sundays, which are dies non, on, which the court cannot sit. That such is the construction of every such law in this State, unless where a contrary intention is clearly indicated in the law, 'is expressly decided by this court in the recent case of Michie, &c., v. Michie's adm'r, &c., 17 Gratt. 109, in which it was held that Suuday, being dies non juridicus, is not one of the days of the term of a court. See also the Code, ch. 16, § 17, 8th clause, p. 115 ; and Hill's case, 2 Gratt. 594, 612-13. A contrary intention is not indicated in the act of 1867. The counsel for the prisoner seemed to think that it was by the provision that the court may adjourn “to any day within the fifteen days.” But that means “ any juridical day. within the fifteen judicial days, during which the court is authorized to be continued.” It is much more important that the law should be settled than that it should be settled in any particular way (which indeed is a matter of little importance), and it has accordingly been settled with us. I am, therefore, of opinion that the County court did not err in overruling the prisoner’s motion to arrest the judgment.
I have now considered and disposed of all the questions arising in this case. I regret that my opinion should have been extended to so great length, but felt that it was proper to examine fully the arguments made by the very able counsel of the prisoner, both in this cuirt and in the court below. I think there is no error in the judgment, and am for affirming it.
Anderson, J.
“ When fresh provocation occurs be *955 tween preconceived malice and death, it ought clearly to appear that the killing was upon the antecedent malice, which may be difficult in some cases to show satisfactorily, if the new7 provocation be a grievous one. In such cases, says Hawkins, it should not be presumed tb&t they fought on the old grudge, unless it appear by the whole circumstances of the fact.” Wharton’s Crim. Law, 6 Ed., § 955; 1 Russell 484. I do not think it appears from the evidence in this case that the prisoner had preconceived malice. It is true that he threatened the prosecutor that if he did not withdraw a grievous charge he had made against him, he would shoot him. But such threat does not seem to have been made in malice. The prisoner did not so regard it; for their relations, which were of the most friendly character, were not affected by it. They seemed to have met and parted as friendly as before, associated together, drank together, and talked with each other in the most friendly manner. And the prosecutor evidently did not regard his threats as serious. The prisoner does not appear to be a malicious man, as he is exhibited in this record. His conduct was not that of a man who had a murderous purpose. He was doubtless grieved by the imputation made upon his character, and his threat of shooting was evidently made, not with a malicious or murderous purpose, but as a means of relieving his character from the imputation, by inducing Merriman, the prosecutor, to withdraw it. I do not think from the evidence that he had formed a fixed resolution to put his threats in execution ; but he had serious thoughts of it on the day the shooting took place, as is shown by the inquiry he made of of the witness Wingfield, will you back me if I get into any difficulty ; will you go my bail ? He was evidently considering the consequences of such an act, if he was not too drunk then for reflection. But it does not show that he had made up his mind to it.
But whatever may have been bis intention or purpose *956 ^16n’ ^ ^ was *° s^00k^ie prisoner, I think the evidence shows plainly that he abandoned it.
If there was p'reconceived malice, it appears from the evidence that he received grievous fresh provocation ; and it does not clearly appear from the evidence, in my opinion, that the shooting was upon the antecedent , malice, which, as we have seen, it was incumbent on the Commonwealth to make clear. On the contrary, I think it does plainly appear that it was caused by the fresh provocation. I am convinced from the evidence, that the prisoner would not have shot if he had not been struck by Merriman. And there is no evidence that he did any thing to provoke him to strike him. On the contrary, the evidence shows that he endeavored to appease him ; that he put his hand gently upon him and begged him to desist, and let the matter drop, when he was struck a blow by Merriman, as to the force and violence of which there is a difference of opinion among the witnesses ; but which was of sufficient violence, according to the testimony of Merriman himself, to stagger him back two" or three feet; according to the testimony of other witnesses eight or ten feet, and according to the testimony of one to fell him to the ground, he catching on his hands. Ho other witness saw him fall. The prisoner then drew his pistol, and about the same time Merriman attempted to draw his, but it hung in his coat, and the prisoner shot first, evidently, according to the testimony of the physician who dressed Merriman’s wounds and extracted the ball, while he (Merriman) was in the act of drawing his pistol.
I concur with the president in his exposition of the law, and only differ from him in inference from the facts proved. I regard the certificate of the judge of the court of trial as a certificate of facts, upon the authority of our decision in McClung’s adm'r v. Ervin, recently decided and not yet reported, in which the cases on the subject of new trials are reviewed. But if it is a cer *957 tificate of evidence, as was said by Judge Brockenbrougb in Green v. Ashby, 6 Leigh, p. 135, I can perceive no difference between evidence admitted to be true and facts proved. In this case I do not think there is any material or substantial conflict in the evidence, or facts certified as proved. Some of the witnesses saw what others did not, as is universally the case among the witnesses of such conflicts. And the difference as to the force of the blow struck is only a difference of opinion. The effect of the blow, according to all the testimony, shows that it was a violent one ; as, indeed, it is most likely it would have been from a man who exhibited the indecent rage and violence that MerrimaD did at the time.
I am of opinion, therefore, that the fresh provocation which there is no evidence to show was incited by the prisoner, is sufficient to account for the shooting, and that the jury were not justified by the evidence in ascribing it to preconceived malice—if, indeed, any ever existed. I think the evidence shows that the prosecutor was to blame from the beginning to the end of the controversy. lie charged the prisoner with stealing his money, and instead of prosecuting him for it, and discarding him as a thief, he was cheek by jole with him. whenever they met; his social and friendly intercourse with him were unaffected by the belief of Merriman that he was a felon. But on the occasion of the fight, conscious of being armed himself with a revolver, he goaded the prisoner to make an assault on him, by hectoring and bullying over him, and belching in his teeth the most abusive and insulting language, and assuming towards him the most offensive attitudes, all of which was unavailing to provoke the prisoner to an attack, until he, without provocation, struck the blow which sent him .reeling from him; and then the prisoner drew his pistol (the prosecutor drawing his almost simultaneously) and fired on him, and slightly wounded him. *958 Some little time elapsed before the second fire, when they both fired nearly simultaneously, and Merrimau was again slightly wounded. They had one or two more rounds, Merriman’s pistol snapping every time, when the prisoner retreated iuto the tavern near by, one barrel of his revolver being still loaded, and Merriman pursued him to the door, apparently anxious to continue the fight.
I am of opinion, from the best view I can take of the evidence, that the fresh provocation, which there is no evidence to show was incited by the prisoner, is sufficient to account for the shooting; and that the jury were not justified by the evidence in ascribing it to preconceived malice.
•I deem it unnecessary to notice the other grounds on which the reversal of the judgment is asked, this being, in my opinion, sufficient. But I will only add that I think it a bad practice, during the pendency of a criminal trial, to commit the custody of the prisoner to a sheriff, who is examined as a witness for the Commonwealth, whether he had been regularly subpoenaed as a witness or not. In order to preserve the purity of trial by jury, I am not prepared to say that public policy does not require that the judgment in this case should be reversed upon that ground alone, if there was no other.
Upon the whole, I am of opinion that the judgment should be reversed, and a new trial awarded the prisoner.
Christian and Staples, Js., concurred in the opinion of Moncure, P.
Bouldin, J. concurred in the opinion of Anderson, J.
Judgment affirmed.